COURT
OF APPEALS

                                         SECOND
DISTRICT OF TEXAS

                                                     FORT
WORTH

 

 

                                           NO. 2-08-029-CV

 

 

IN THE
INTEREST OF M.M., M.M, 

AND M.M., CHILDREN                                                                           

 

                                                  ------------

 

             FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                                  ------------

 

                                  MEMORANDUM OPINION[1]

 

                                                  ------------

 

I.  Introduction

Appellant Rebecca M. appeals the trial court=s
judgment terminating her parental rights to her three children.  In three issues, Rebecca argues that the
evidence is legally and factually insufficient to support the trial court=s endangering
environment and endangering conduct findings and that the evidence is factually
insufficient to support the trial court=s best
interest finding.  We will affirm.

 








II.  Factual and Procedural Background

Rebecca has been married twice and is the mother
of several children.  The children at
issue in this termination proceeding are MM1, MM2, and MM3, and their father is
Randy.  Because Rebecca is the only party
appealing, we will set forth below the facts pertinent to the termination of
her parental rights.

A.     Adoption of Rebecca=s First
Two Children

During a prior marriage to John, Rebecca gave
birth to two children.  Rebecca later divorced
John and began dating Randy in 1995.  

Rebecca began using drugs when she was eighteen
or nineteen years old and started regularly using drugs at age twenty-eight or
twenty-nine.  Rebecca admitted that she
used drugs when her children were ages three and five but said that she did not
use drugs when the children were around. 

When Rebecca got in trouble with the law around
1999, she thought it was in her children=s best
interest for them to be privately placed with and adopted by Rebecca=s
parents, Robert[2]
and Gloria.  These children are now
fifteen and seventeen years old and are not part of the current suit.  Rebecca has been allowed to see them, but she
has never been allowed to be alone with them. 









B.      Rebecca=s Second
Marriage

Rebecca and Randy continued their relationship
and considered themselves common-law husband and wife.  Rebecca worked outside the home, manicuring
nails and cleaning her landlord=s
house.  

Randy admitted using drugs with Rebecca and said
that both he and Rebecca sold drugs; however, Rebecca testified that she did
not use drugs with Randy but admitted that she sold drugs.  Randy had been using amphetamines since 1992
and had been in jail Aa lot of times@ for
drugs, assault-bodily injury, and robbery.[3]  Randy and Rebecca agreed to not use drugs
anymore once they found out that Rebecca was pregnant with MM1. 








Rebecca gave birth to MM1 on June 25, 2004.  Rebecca reported that her last drug usage was
around December 2004, which indicates that she may have been using drugs when
she was pregnant with MM1.  Rebecca,
however, later testified that she did not use drugs when she was pregnant with
MM1.  Rebecca admitted that, after MM1=s birth,
she cared for MM1 while she had drugs in her system; she also admitted that
drugs found in her house in 2004 were drugs that she was selling.  She said that she did not sell drugs from her
house but instead delivered them to people=s
houses.  Based on this conduct, Rebecca
was charged with delivery and manufacture of a controlled substance in December
2004 and was jailed in 2005 for possession of marijuana.  Randy watched MM1 while Rebecca was in jail. 

C.     CPS Enters the Picture

Rebecca continued using drugs and gave birth to
MM2 on June 30, 2006.  On that same day,
someone at the hospital made a referral to CPS because MM2 and Rebecca tested
positive for amphetamines.  








Jennifer Cook, the initial investigator with the
Texas Department of Family and Protective Services (TDFPS), testified that she
visited Rebecca at the hospital and that Rebecca admitted that she had used
marijuana and methamphetamine with a girlfriend a few days prior to giving
birth to MM2.  Although Randy tested
negative for drugs, CPS placed MM1[4]
and MM2[5]
in foster care because Randy and Rebecca were living together, which raised the
concern that the children would be around drugs.  Rebecca told Cook that her parents were not a
placement option for MM1 and MM2 because they were already raising two of her
children.  Rebecca thereafter
disappeared. 

Three weeks later, CPS returned the children to
Randy under a temporary order.  TDFPS
believed that the children would not have contact with Rebecca because Randy
had told them that no one had any contact with her.  

D.     CPS Enters the Picture a Second Time

Cook attempted a home visit in September 2006,
but no one was there, and the phone had been disconnected.  Cook also contacted the person that Randy had
listed as a babysitter and that person stated that she had never heard of Randy
or his children.  Because Randy had
possession of MM1 and MM2 and because Cook could not find him, she made a
referral to a private investigator.  








Five months later, on February 9, 2007, the
private investigator located the children, along with Rebecca and Randy, in a
motel.  Rebecca was arrested on felony
warrants,[6]
and CPS placed the children back in foster care.[7]  Rebecca and Randy gave the children=s
belongings to CPS and also apparently accidentally included a shredder, an
instrument that could read or write checks, and pornography. 

Wells visited Rebecca while she was in jail and
set up services for her.  Wells did not
help Rebecca get into First Choice, a program that allows children to be with
their mothers while in rehab, because Rebecca was in jail and therefore
ineligible for First Choice.  Wells also
set up services for Randy.  Randy refused
numerous drug tests, and when he eventually consented to a hair follicle testCwhich
tests for drug usage in the prior three monthsCin March
2007, it came back with very high positive results for amphetamines and
methamphetamine, which shows that he had used these drugs while he had the
children with him. 

E.      CPS Enters the Picture a Third Time

While Rebecca was in jail, she did not tell
anyone that she was pregnant.  Towards
the end of her pregnancy, Rebecca wrote a letter to Randy to let him know that
she was pregnant, and it was mailed the same day that MM3 was born. 








Wells testified that Randy contacted her and told
her that Rebecca had given birth to MM3 in a jail in Galveston.[8]  After giving birth, Rebecca signed a power of
attorney, asking Monday O=Neal to care for MM3.  O=Neal
drove down to Galveston to get MM3 and brought her back to Fort Worth. 

Wells and other CPS supervisors went to the house
where O=Neal was
staying.  Wells was the first to arrive
and saw O=Neal with the baby.  Wells noticed that O=Neal=s teeth
were rotten, that she was very jittery, that she was not clean, that she did
not make eye contact, and that she appeared to be a drug user.  

Lee Ann Marks, a CPS investigative supervisor,
testified that she and another supervisor named Stacey Ladd also went to the
house where MM3 was allegedly living. 
They found MM3 with O=Neal in
a house across the street from where Randy was living.  The bedroom in which O=Neal and
MM3 were allegedly staying did not have air conditioning or baby clothes or a
baby crib, and the bed had car parts strewn all over it.  Marks noted that there were no baby items in
the home.  








Ladd went into Randy=s home,
across the street from where O=Neal was
allegedly living, and found baby items in that home.  Although Randy had told her that O=Neal
cared for the baby and lived across the street, Ladd believed that MM3 was
staying with Randy based on the baby items that were found at his house and the
lack of such items at the house across the street.  Randy later admitted that O=Neal was
caring for MM3 at a motel because she did not have a place to live. 

While Marks and Ladd were there, O=Neal
acted very jittery and nervous, so Marks gave her a drug test.  O=Neal
tested positive for marijuana, benzoylecgonines, cocaine, and
methamphetamine.  Because O=Neal had
previous criminal and CPS histories and was an inappropriate placement for MM3,
CPS placed MM3 in foster care.  Although
Randy testified that he had known O=Neal for
two or three years and that he had never known her to use drugs, Randy told
Wells that he was glad that they had come out because he was not comfortable
with O=Neal
keeping MM3 and that she would be safer in foster care. 

F.      Grounds to Terminate Rebecca=s
Parental Rights








CPS ultimately moved to terminate the parental
rights of both Rebecca and Randy based on endangering environment and
endangering conduct grounds, among others. 
Wells testified that Rebecca had placed her children in a dangerous
environment because she was under the influence of drugs or on the run with the
children while she had outstanding felony warrants, demonstrating that she did
not provide a safe, stable environment for her children.[9]  Wells further stated that she believes that
Rebecca=s
decision to place her baby (MM3) with O=Neal and
her decision to use drugs is Anot only
placing but is allowing the child to remain in conditions or surroundings which
endanger the physical and emotional well-being of the child.@  Wells believes that Rebecca has demonstrated
an inability to provide her children with a safe environment due to her drug
history (which included giving birth to a baby who tested positive for drugs),
criminal history,[10]
and incarceration, which also constituted engaging in conduct or knowingly
placing the children with persons who engaged in conduct which endangered the
physical or emotional well-being of the children. 

 

 








G.     CPS=s and
the Ad Litem=s Recommendations

Wells asked the court to terminate the
parent-child relationship, stating that termination was in the best interest of
the children.  Wells said it was in the
children=s best
interest for the Department to be named managing conservator so that the
children could continue to receive subsidies and asked that the foster parents
be named possessory conservators. 

Jesus Nevarez, the ad litem, also recommended
that the court terminate Rebecca=s and
Randy=s
parental rights because the children needed a chance to grow up in a healthy
and safe environment. 

H.     Trial Court=s
Disposition

After hearing the above evidence, the trial court
found by clear and convincing evidence that Rebecca had knowingly placed or knowingly
allowed her children to remain in conditions or surroundings that endangered
the physical or emotional well-being of the children, that she had engaged in
conduct or knowingly placed the children with persons who engaged in conduct
that endangered the physical or emotional well-being of the children, and that
termination of the parent-child relationship was in the children=s best
interest.  The trial court therefore
terminated the parent-child relationship between Rebecca and MM1, MM2, and MM3.


 








III.  Burden
of Proof and Standard of Review

A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re E.M.N., 221
S.W.3d 815, 820 (Tex. App.CFort
Worth 2007, no pet.).








In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, TDFPS must
establish one ground listed under subdivision (1) of the statute and must also
prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon Supp. 2008); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic
remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  In
re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77,
83 (Tex. App.CFort Worth 2006, pet.
denied).  It is defined as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@ 
Tex. Fam. Code Ann. ' 101.007
(Vernon 2002).








In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a factfinder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could, and disregard contrary evidence unless a
reasonable factfinder could not.  Id.

We must therefore consider all of the evidence,
not just that which favors the verdict. 
Id.  But we cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the factfinder=s
province.  Id. at 573B74.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s determinations
as long as they are not unreasonable.  Id.
at 573.








In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s findings
and not supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that the
parent violated section 161.001(1)(D) or (E) and that the termination of the
parent=s
parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108. 

IV.  Legally and Factually Sufficient Evidence of
Endangerment

In her first and second issues, Rebecca argues
that the evidence is legally and factually insufficient to establish that she
endangered her children.  TDFPS argues
that there is ample evidence to support the trial court=s
endangerment findings under sections 161.001(1)(D) and (E) of the family code. 








Endangerment means to expose to loss or injury,
to jeopardize.  Boyd, 727 S.W.2d
at 533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex.
1996).  To prove endangerment under
subsection (D), TDFPS had to prove that Rebecca (1) knowingly (2) placed or
allowed her children to remain (3) in conditions or surroundings that
endangered their physical or emotional well‑being.  See Tex. Fam. Code Ann. '
161.001(1)(D).  Under section
161.001(1)(E), the relevant inquiry is whether evidence exists that the
endangerment of the children=s
physical well‑being was the direct result of Rebecca=s
conduct, including acts, omissions, or failures to act.  J.T.G., 121 S.W.3d at 125; see
Tex. Fam. Code Ann. ' 161.001(1)(E).  Additionally, termination under section
161.001(1)(E) must be based on more than a single act or omission; a voluntary,
deliberate, and conscious course of conduct by the parent is required.  J.T.G., 121 S.W.3d at 125; see
Tex. Fam. Code Ann. ' 161.001(1)(E).  However, it is not necessary that the parent=s
conduct be directed at the children or that the children actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the children=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the children=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).








Stability and permanence are paramount in the
upbringing of children.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A factfinder
may infer from past conduct endangering the well‑being of the children
that similar conduct will recur if the children are returned to the
parent.  See In re D.L.N., 958
S.W.2d 934, 941 (Tex. App.CWaco
1997, pet. denied), disapproved on other grounds by J.F.C., 96
S.W.3d at 256, and C.H., 89 S.W.3d at 17.  Drug use and its effect on a parent=s life
and her ability to parent may establish an endangering course of conduct.  Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).

Evidence of criminal conduct, convictions, and
imprisonment prior to the birth of a child will support a finding that a parent
engaged in a course of conduct that endangered the child=s
well-being.  J.T.G., 121 S.W.3d at
133.  While imprisonment alone does not
constitute a continuing course of conduct that endangers the physical or
emotional well-being of a child, it is a fact properly considered on the issue
of endangerment.  Boyd, 727 S.W.2d
at 533B34; R.W.,
129 S.W.3d at 743B44.

The record contains substantial evidence of
subsection (D) environmental endangerment and subsection (E) course of conduct
endangerment to the physical or emotional well‑being of the
children.  Because the evidence
concerning these two statutory grounds for termination is interrelated, we
consolidate our examination of it.  See
J.T.G., 121 S.W.3d at 126.








The record demonstrates that Rebecca had a long
history of illegal drug use.  Rebecca
admitted that she had used drugs, had kept drugs in her house, had sold drugs,
and had cared for MM1 while she had drugs in her system.  In addition to using illegal drugs, the
record reveals that Rebecca had a criminal history that included an arrest in
2001 for possession of a controlled substance; a conviction for felony of
possession of four to two hundred grams of methamphetamine; a charge for
delivery and manufacture of a controlled substance in December 2004;
incarceration in February 2005 for possession of marijuana; an arrest in June
2005 for giving a false urinalysis; twelve jail book-ins; and seven
forgeries.  The record also demonstrates
that Rebecca relied on others to parent her children while she was incarcerated
and that the people whom she chose to watch her children were also drug users. 








We have carefully reviewed the entire
record.  Looking at the evidence in the
light most favorable to the trial court=s
findings, giving due consideration to evidence that the trial court, as
factfinder could reasonably have found to be clear and convincing, we hold that
a reasonable trier of fact could have formed a firm belief or conviction that
Rebecca knowingly placed MM1, MM2, and MM3 in conditions and engaged in conduct
that endangered the children=s
physical or emotional well‑being.  See
Tex. Fam. Code Ann. ' 161.001(1)(D), (E); J.F.C.,
96 S.W.3d at 265B66; C.H., 89 S.W.3d at
25; J.T.G., 121 S.W.3d at 124; In re T.J., No. 02-05-00353-CV,
2006 WL 820518, at *6 (Tex. App.CFort
Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that evidence was legally and
factually sufficient to support trial court=s
findings on endangerment due to mother=s and
father=s
criminal history and illegal drug use). 
Accordingly, we hold that the evidence is legally and factually
sufficient to support the trial court=s
finding on environmental endangerment and course of conduct endangerment.  We overrule Rebecca=s first
and second issues.

V.  Termination Was In The Children=s Best
Interest

In her third issue, Rebecca argues that the
evidence is factually insufficient to support the trial court=s
finding that termination of her parental rights was in the children=s best
interest.  TDFPS argues that there is
ample evidence to support the trial court=s Abest
interest@
finding.  








Prompt and permanent placement of the child in a
safe environment is presumed to be in the child=s best
interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  There is also
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:  (1)
the desires of the child; (2) the emotional and physical needs of the child now
and in the future; (3) the emotional and physical danger to the child now and
in the future; (4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best
interest of the child; (6) the plans for the child by these individuals or by
the agency seeking custody; (7) the stability of the home or proposed
placement; (8) the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and (9) any
excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).  

These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

Regarding the first factor, the children did not
testify at trial.  However, the evidence
demonstrated that Rebecca has no ability to parent the children and that there
is no indication that MM3 even knows who Rebecca is because she had never
visited with her.  Rebecca has also not
visited with MM1 and MM2 because she has been in prison, nor has she sent any
letters or cards to the children while she has been in prison.  Although the evidence revealed that Randy and
Rebecca love their children, the children are Avery,
very bonded to the foster parents@ and
call them Amommy@ and Adaddy.@








Regarding the second factorCthe
children=s
present and future physical and emotional needsCWells
testified that MM1 and MM2 were age appropriate.  The foster mother, however, said that MM1
wanted to sleep on the couch and that MM2 acted like she had never slept in a
bed or been in a high chair or car seat. 
MM1 ate a lot when he first arrived and occasionally still hoards food,
and MM2 appeared to be very solemn or in a daze.  MM1 and MM2 attend Head Start Monday through
Friday.  MM3 is being evaluated because
she may be below level because she does not sleep through the night.  Wells testified that the foster parents are
currently meeting all three children=s
physical and emotional needs and could do so in the future. 

The environmental endangerment and endangering
course of conduct discussion above addressed the third, fourth, and eighth
factorsCthe
present and future physical and emotional dangers to the children, as well as
Rebecca=s
parenting abilities, or lack thereof, and her acts and omissions.

Concerning the fifth factor, Rebecca attempted to better herself
while in prison by attending parenting classes, the Christians Against
Substance Abuse class, the Voyager=s class,
the fifty-two week life-changing behavior class, the Wells class (for disease
control), AIDS awareness class, and the CHANGES class to change her way of
thinking. 








Regarding the parties= plans
for the childrenCthe sixth factorCRandy
described Rebecca as a Agood person@ but
said that he thinks she has a disease and needs to undergo drug treatment to
learn how to control the disease.  Randy
testified that he does not think that the children should be turned over to
Rebecca because she needs to be given a chance to work her program, to be
sober, to get a support system in place, and to prove that she is serious about
staying clean before she is allowed to take care of the children.  Randy told the trial court that it was in the
children=s best
interest for them to be returned to him, but if the trial court chose not to
place the children with him, he wanted the trial court to place the children
with Rebecca=s parents instead of the foster
parents because the foster parents had both been married before and had not
been married to each other very long. 








Rebecca initially told Wells that when she is
released in February 2009, she wants to move in with her mother.  Rebecca later testified that her plan is to
go her friend Karen Morrison=s and
that she had never planned to go to her mother=s
house.  Rebecca testified that she does
not want her parental rights terminated and that she wants to be part of her
children=s lives,
but she admitted that she is Anot
expecting to get out and be able to have [her] kids at any point in time as of
right now.@ 
Rebecca asked the court for another chance because she has not ever Areally
gotten into any kind of program that=s set
[her] up with the tools [she] need[s], the people [she] need[s, and] the things
[she] need[s] to have a network to stay clean.@  Rebecca would still like to enter the First
Choice Program, but she does not want to Aput [her
kids] through all this anymore.@  Rebecca therefore asked the court to give the
children to Randy because he has a lot of people to help him.  If the children could not be placed with
Randy, Rebecca said that it was in her children=s best
interest to be placed with her parents, though she admitted that her mother did
not have a bond with MM1 and MM2 as of February 2007. 

Wells testified that CPS=s plan
is for the children to be adopted by the foster parents. 

Regarding the stability of the proposed placementCthe
seventh factorCthe evidence demonstrated that
terminating Rebecca=s parental rights would allow
CPS to pursue adoptive placements for the children, which would allow them to have
the stability lacking in their current situation. 

Finally, concerning the ninth factorCany
excuse for the parents= acts or omissionsCRebecca
admitted that she regrets the choices she has made, that A[e]verything
that=s going
on right here is [her] fault,@ that
she had the opportunity to change and abused it, and that it is not fair to
continue putting her children in danger. 
Although Rebecca did not think that using drugs made her a bad parent,
she admitted that putting her children in danger makes her a bad parent and
that she had done nothing to show the court that she deserved her three
children back. 








Giving due consideration to evidence that the
factfinder could have reasonably found to be clear and convincing, and based on
our review of the entire record, we hold that a reasonable trier of fact could
have formed a firm belief or conviction that the termination of Rebecca=s
parental rights would be in the children=s best
interest.  See In re S.M.L., 171
S.W.3d 472, 480 (Tex. App.CHouston
[14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed
that termination of father=s
parental rights was in child=s best
interest where, among other factors, father was incarcerated at time of
termination hearing and had a pattern of criminal and violent conduct).  Accordingly, we hold that the evidence is
factually sufficient to support the trial court=s
best-interest finding.  We overrule
Rebecca=s third
issue.

VI.  Conclusion

Having overruled Rebecca=s three
issues, we affirm the trial court=s order
terminating her parental rights to MM1, MM2, and MM3.

 

 

SUE
WALKER

JUSTICE

 

PANEL: DAUPHINOT, HOLMAN,
and WALKER, JJ.

 

DELIVERED:  December 11, 2008











[1]See Tex. R. App. P. 47.4.





[2]Robert became Rebecca=s stepdad when she was
three, but she considers him her dad.





[3]The record revealed that
Randy had been booked into jail forty-two times and that he had thirteen
separate cases for crimes, including assault-bodily injury, assault with a
deadly weapon, robbery causing bodily injury, unlawfully carrying a weapon,
terroristic threat, and several drug charges.





[4]Cook testified that when
she saw MM1 on July 1, 2006, he did not appear to have been neglected.  MM1 was appropriately dressed, was on target
with his weight and size, and exhibited no bruises or developmental delay.





[5]Cook testified that MM2
weighed seven pounds, eleven ounces at birth and that she had a good Apgar
score in spite of the drugs in her system.





[6]Rebecca had three
warrants for her arrest: two for controlled substance possessions that occurred
in December 2006 and February 2007 and one for giving a false
urinanalysis.  She has been incarcerated
continuously since February 9, 2007.





[7]Shawna Wells, the ongoing
caseworker for the children at issue, testified that MM1 and MM2 were age
appropriate, that there were no marks on the children, that they were not dirty
or malnourished, that they did not have any infections, and that MM1 was
potty-trained.





[8]The record revealed that
MM3 was born July 24, 2007.





[9]Wells said that she has
lost count of the number of places Randy has lived since CPS opened a case on
them.





[10]The record revealed that
Rebecca was arrested in 2001 for possession of a controlled substance; that she
was convicted of the second-degree felony of possession of four to two hundred
grams of methamphetamine and sentenced to two years= confinement; that she
was charged with delivery and manufacture of a controlled substance in December
2004 when MM1 was six months old; that she was jailed in February 2005 for
possession of marijuana; that she was arrested in June 2005 for giving a false
urinalysis; that she had been booked into jail twelve times; and that she had
seven forgery charges on her record.